**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**NATESHA CLARK, KISHI WALKER, and**
**SHARONDA MOLBROUGH,** individually,
and on behalf of others similarly situated,

          Plaintiff,

vs.

**ACCENTURE LLP** an Illinois Limited
Liability Partnership,

          Defendant.

Case No.: 1:23-CV-05451

Hon.: LaShonda A. Hunt

---

**PLAINTIFFS' UNOPPOSED MOTION AND INCORPORATED MEMORANDUM OF**
**LAW FOR COLLECTIVE SETTLEMENT APPROVAL**

## TABLE OF CONTENTS

I.      Introduction.................................................................................................................1

II.     Procedural History .....................................................................................................2

III.    Factual Overview .......................................................................................................5

        A.  The Parties......................................................................................................5

        B.  Allegations of Off-the-Clock Work ...............................................................5

        C.  Defendant's Defenses to the Alleged Off-the-Clock Work ............................6

        D.  Summary of Discovery Conducted Prior to Settlement..................................7

        E.  Facts Regarding the Settlement Collective and Defendant's Potential Exposure....7

IV.     Terms of the Settlement .............................................................................................9

        A.  The Settlement Fund ......................................................................................9

        B.  The Settlement Collective ..............................................................................9

        C.  Settlement Claims Administration .................................................................9

        D.  Notice and Claim Procedure ........................................................................10

        E.  The Releases.................................................................................................11

        F.  Allocation Formula.......................................................................................11

        G.  Collective Representative Service Awards ...................................................12

        H.  Attorney Fees and Litigation Costs..............................................................12

V.      Argument in Support of Approval ...........................................................................13

        A.  Standard for Approval..................................................................................13

        B.  Procedure for FLSA Collective Action Settlements .....................................13

        C.  The Settlement Provides a Fair and Reasonable Resolution of
            Bona-Fide Disputes.......................................................................................14

            1.  The Amount of the Settlement is Fair and Reasonable.....................14

2.  The Method of Distributing the Settlement is Fair and Reasonable ................16

3.  The Proposed Notice is Fair and Reasonable ....................................................16

D.  The Required Collective Representative Service Awards are
Fair and Reasonable ........................................................................................17

E.  The Requested Attorney fees are Fair and Reasonable ..........................................18

1.  The Court Should Award Attorneys' Fees as a Percentage of the Fund ..........18

2.  Results and Benefits Conferred Upon the Class Justify the Fee Award..........21

3.  Analysis of the Market for Legal Services Supports Plaintiffs' Fee Request...22

a.  Plaintiffs' Request for One-Third of the Settlement Is the Normal Rate
Rate of Compensation in the Northern District of Illinois Market.............22

b.  The Risk of Nonpayment Was Significant .................................................24

4.  Plaintiffs' Counsel's Fee Request is Reasonable and Should Be Approved
Without a Cross-Check ...................................................................................25

F.  Litigation Costs, and Settlement Administration Costs..........................................26

V.  Conclusion ..............................................................................................................26

Certificate of Service ............................................................................................................28

# TABLE OF CASES

*Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982)………….. 13,14

*Ceniceros v. Pactiv, LLC*, No. 18-CV-1759, 2019 WL 13252838, at *1 (N.D. Ill. Jan. 17, 2019)…………………………….................................................................... 13

*Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 994-95 (N.D. Ind. 2010)………………………….................................................................. 13, 23-24

*Butler v. Am. Cable & Telephone, LLC*, No. 09 Civ 5336, 2011 WL 4729789, at *8-9 (N.D. Ill. Oct. 6, 2011)……………………………....................................... 13

*Roberts v. Apple Sauce, Inc.,* No. 12 Civ. 830, 2014 WL 4804252, at *2 (N.D. Ind. Sept. 25, 2014).) ………………………….......................................................... 13

*Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)........................................................13

*Briggs v. PNC Fin. Servs. Grp., Inc.,*………............................................ 13,14,17,18,19, 22, 24, 26

*Koszyk v. Country Fin. a/k/a CC Servs., Inc.*, No. 16 Civ. 3571, 2016 WL 5109196, at *1 (N.D. Ill. Sept. 16, 2016)……………………….........................................................13,18,19,23, 24, 25

*Watson, et al. v. BMO Financial Corp. and BMO Harris Bank, N.A.*, No. 15 Civ. 11881 (N.D. Ill. July 11, 2016) (St. Eve, J.), …………….......................................................13
*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013………………………….......................................................................13

*Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1529 (2013)………………………….......................................................................13

*McKenna v. Champion Int'l Corp.*, 747 F.2d 1211, 1213 (8th Cir. 1984), *abrogated on other grounds by Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989),) ........................................14

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013)............................................ 14

*Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982)……………….…………14

*Prena v. BMO Fin. Corp.,* No. 15 C 09175, 2015 WL 2344949 (N.D. Ill. May 15, 2015)……………………………………………………14, 19, 24

*Castillo v. Noodles & Co.*, No. 16-CV-03036, 2016 WL 7451626, at *1 (N.D. Ill. Dec. 23, 2016)………………………………………….…..……...14,18, 19,24, 26

*Furman v. At Home Stores LLC*, No. 1:16-CV-08190, 2017 WL 1730995 (N.D. Ill. May 1, 2017)………………………………………………..………14,18, 19,24

*Kujat v. Roundy's Supermarkets Inc.*, No. 1:18-CV-05326, 2021 WL 4551198
(N.D. Ill. Aug. 11, 2021)……………………………………….…………………..14, 19,24

*Brewer v. Molina Healthcare, Inc.*, No. 1:16-CV-09523, 2018 WL 2966956
(N.D. Ill. June 12, 2018)……………………………………………………………..14,18, 19, 24

*Benoskie v. Kerry Foods, Inc.*, No. 19-CV-684-PP, 2020 WL 5769488
(E.D. Wis. Sept. 28, 2020)……………………………………………        …………14, 19, 24

*Mollett v. Kohl's Corp.*, No. 21-CV-707-PP, 2022 WL 4641082
(E.D. Wis. Sept. 30, 2022)……………………………………………..…..…………14, 19, 24

*Winking v. Smithfield Fresh Meats Corp.*, No. 1:22-CV-01937, 2022 WL 16706898
(N.D. Ill. Nov. 4, 2022)………………………………………….……………………14, 19, 20, 24

*Summers v. UAL Corp. ESPO Comm.*, No. 03 Civ. 1537, 2005 WL 3159450, at *2
(N.D. Ill. 22, 2005)………………………………………………………..…………………16

*Gallant v. Arrow Consultation Servs., Inc.*, No. 19-CV-0925, 2020 WL 2113399…....16, 19, 24

*Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)…………………………….………..17

*Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, at *7
(S.D.N.Y. June 25, 2007)……………………………………………………………….……..17

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)………………………….....…..18, 19

*Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 548 (7th Cir. 2003)………………..……….19

*Sutton v. Bernard*, 504 F.3d 688, 691-92 (7th Cir. 2007)..……………………….……19, 22, 24

*Skelton v. G.M. Corp.*, 860 F.2d 250, 252 (7th Cir. 1988)……………………………....19, 20

*Kaplan v. Houlihan Smith & Co.*, No. 12 Civ. 5134, 2014 WL 2808801, at *3
(N.D. Ill. June 20, 2014)……………………………………………………………………19

*Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565-66 (7th Cir. 1994)…………………19, 20

*Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *7
(N.D. Ill. Oct. 10, 1995)………………………………………………………..……..19

*Matter of Continental Illinois Securities Litigation*, 985 F.2d 867 (7th Cir. 1993)…………...19

*Chen v. Genesco, Inc.*, No. 118CV00690SEBTAB, 2020 WL 360517, at *5
(S.D. Ind. Jan. 22, 2020)…………………………………………………….………19, 24

iv

*Day v. NuCO2 Mgmt., LLC*, No. 1:18-CV-02088, 2018 WL 2473472, at *2
(N.D. Ill. May 18, 2018)……………………………………………………..…………19, 20, 24

*In re Synthroid Mktg. Litig.*, 325 F.3d 974, 979-80 (7th Cir. 2003)………..……20, 22, 23, 25-26

*Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N.D. Ill. 1996), *aff'd*,
160 F.3d 361 (7th Cir. 1998)……………………………………….……..………20-21, 24, 25

*In re Amino Acid Lysine Antitrust Litig.*, No. 95 Civ. 7679, 1996 WL 197671, at * 2 (N.D. Ill.
Apr. 22, 1996)………………………………………………………...………………20

*Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)……………………………………………..20

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1040 (N.D. Ill.
2011)……………………………………………………………………………………………20-21

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 48-49 (2d Cir. 2000)…………………..……21

*Steele v. GE Money Bank*, No. 1:08-CIV-1880, 2011 WL 13266350, at *4 (N.D. Ill. May 17,
2011)………………………………………………………..…………………………………21

*Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005)……………..…………..………22, 24

*Donovan v. Estate of Frank E. Fitzsimmons*, 778 F.2d 298, 309 (7th Cir. 1985)………………..22

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 844-45 (N.D. Ill.
2015)………………………………………………………………………….…………23

*In re Cont'l Ill. Secs. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992)…………………………………25

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 n. 27 (N.D. Ill. 2011)…………………..25

*In re Forefront Data Breach Litig.*, No. 21-CV-887, 2023 WL 6215366, at *8 (E.D. Wis. Mar.
22, 2023)………………………………………………………………………………25

*In re Stericycle Sec. Litig.*, 35 F.4th 555, 567 (7th Cir. 2022)…………………………………..25

*Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)……………………………………………25

*Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011)…………………..25

*Beesley v. Int'l Paper Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *3 (S.D. Ill. Jan.
31, 2014)……………………………………………………………………………25

## I.        INTRODUCTION

This is a wage-and-hour putative collective/class action that arises from claims of alleged unpaid wages in a remote call center setting. The Named Plaintiffs, Natesha Clark, Kishi Walker, and Sharonda Molbrough (hereinafter "Named Plaintiffs") and approximately 4,223 other individuals performed services as independent contractors through third-party staffing firms for assignments as remote hourly Contact Center Support Agents ("CCSAs") for Accenture LLP ("Defendant"). All the CCSAs involved in this case were engaged through third-party staffing firms to provide services to Defendant on the State of Massachusetts Health Connector, State of Michigan Unemployment Insurance Agency, State of Kansas COVID-19 Contact Tracing, or State of New Mexico Health of Human Services projects, between November 22, 2020 and January 28, 2024 (hereinafter, "Settlement Collective").

In the present Motion for Settlement Approval, Plaintiffs seek approval of a proposed $1,695,000.00 common fund Settlement Agreement and Release of Claims (the "Agreement") on behalf of the putative Settlement Collective. Only for purposes of effectuating the Parties' Agreement, Defendant has stipulated to certification of the Settlement Collective.[1] *See generally*, *Exhibit 1*, the Agreement.

In the First Amended Complaint ("FAC"), the Named Plaintiffs alleged that Defendant failed to pay CCSAs for the time spent logging into and out of essential computer systems required to perform their job duties. However, from the onset of this case, Defendant has strongly contested Plaintiffs' allegations. Furthermore, Defendant continues to deny that it ever employed Plaintiffs, and asserts they were employed by (and received timekeeping training from) a variety of third-

---

[1] However, if, for any reason, the Parties' Agreement is not approved, then Defendant reserves all rights to oppose certification of this case as a collective or class action. Additionally, Defendant maintains Plaintiffs' claims lack merit and retains all rights and defenses to same.

1

party staffing companies. Defendant also asserts that even if it were deemed a joint employer, Defendant cannot be held responsible for off-the-clock work it did not know, or could not reasonably have known, occurred, and further denies that the CCSAs engaged in off-the-clock activity logging into and out of essential computer systems. In short, as reflected by the record, this is a highly contested case. In fact, the initial Complaint was met by two motions to dismiss under Fed. R. Civ. P. 12.

Despite the diametrically opposed views of the claims, the Parties agreed to engage in substantial informal discovery, and subsequently, to submit the case to mediation.

To conduct the mediation, the Parties hired one of the most recognized wage and hour mediators in the country, Michael Russell.[2] After a full day of mediation, the Parties were unable to reach an agreement. Nonetheless, the Parties agreed to consider a mediator's proposal, which both Parties accepted. Thus, the settlement agreement before the Court is the product of the mediator's proposal – underscoring the true arms-length nature of the negotiations. *Exhibit 1*.

For all the reasons discussed herein, the Named Plaintiffs respectfully submit that the Parties' proposed Settlement Agreement is fair and reasonable in all regards and should be approved in its entirety.

## II.     PROCEDURAL HISTORY

Plaintiffs Clark and Molbrough filed this lawsuit on August 14, 2023. [D.E. 1.] Shortly after filing the initial Complaint, several other CCSAs filed consent to join forms indicating they wished to participate in the lawsuit. On September 1, 2023, Defendant filed an Unopposed Motion for Extension of Time to File Its Responsive Pleading. [D.E. 12.] When Defendant's responsive pleading came due on October 5, 2023, Defendant filed three motions: 1) a Motion to Dismiss and

---

[2] *See*, https://www.michaelrussellonline.com/ (last visited 6/5/2024).

Compel several of the opt-ins to arbitration [D.E. 18-19]; 2) a Motion for Leave to Exceed Page Limits [D.E. 20]; and 3) a Motion to Dismiss Plaintiffs' Complaint and to Strike Class Allegations Related to Unjust Enrichment [D.E. 21-22].[3]

On October 26, 2023, the Named Plaintiffs filed the FAC – the operative complaint. [D.E. 24.] In the FAC, Plaintiffs alleged unpaid overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., straight time wages under the South Carolina Payment of Wages Act ("SWPCA"), straight time wages pursuant to Delaware and Michigan common law claims of breach of contract or (in the alternative) unjust enrichment. More specifically, the FAC alleged approximately 19 minutes per day of off-the-clock work related to pre-, mid-, and post-shift computer bootup and shutdown tasks. [*Id.*]

On November 1, 2023, Plaintiffs filed an opposed Pre-Discovery Motion for Conditional Collective Certification and Court-Authorized Notice to Potential Opt-In Plaintiffs. [D.E. 28-29.] The Court set the Conditional Certification Motion for hearing on November 14, 2023. [D.E. 30.]

In the weeks that followed, the Parties met and conferred regarding various motions and litigation scheduling issues. At the meet and confer, the Parties discussed a method to fairly and adequately investigate the claims asserted, while avoiding the unnecessary expenditures and delays associated with formal discovery and motion practice. Ultimately, the Parties agreed to a process in which they would conduct informal discovery for several months, then attend a non-binding mediation. In the event the Parties were unable to resolve the case after informal discovery and mediation, then the case would return to litigation. [D.E. 33, 35, 36.] To avoid any prejudice to the

---

[3] The Settlement Collective includes CCSAs who were engaged through third-party staffing firms and excludes any CCSA who was hired directly by Accenture as those individuals are subject to arbitration agreements. However, for judicial/arbitral economy, Defendant has agreed to include the claims of the individuals already represented by Collective Counsel (opt-ins Blankenship, Brooks, Dutko, and Smith). Defendant does not waive the right to compel those individuals to arbitration if the Agreement is not approved.

CCSAs' claims, the Parties also negotiated a tolling agreement. [D.E. 34.]

Over the next several months, the Parties conducted the necessary discovery to thoroughly evaluate the claims asserted in the FAC.

The week prior to the mediation, both Parties prepared and submitted detailed mediation statements, which they exchanged with one another to ensure transparency regarding their respective positions. The mediation statements were based on the voluminous documents and data produced during the Parties' informal discovery. To assist in the mediation preparation, and, specifically, the creation of an accurate damage model, Plaintiffs' Counsel enlisted the services of forensic accountant and damages expert, Eric Lietzow, CPA/ABV, of Desmond, Marcello & Amster.[4] With Mr. Lietzow's assistance, Collective Counsel prepared a detailed damage model based on the payroll records produced by Defendant. *Exhibit 2*, Ash Decl. at ¶¶23-24.

As scheduled, on March 25, 2024, the Parties travelled to Nashville, Tennessee and attended a mediation with Michael Russell. *Id*. at ¶31. Representatives for Accenture attended in person and the Named Plaintiffs were available by phone during the mediation to assist Plaintiffs' Counsel. *Id*. After reviewing the arguments raised in the competing mediation statements, and after a full day of arguments and arms-length negotiations, Mr. Russell issued a mediator's proposal. The proposal contained many of the material terms of the Parties' Agreement, including the total common settlement fund amount of $1,695,000.00 and the claims process. On March 29, 2024, the Parties were advised that both sides had accepted the mediator's proposal. *Id*. at ¶¶31-32.

Despite the agreement in principle, the Parties' work was not done. Arms-length negotiations over the details of the long-form Agreement continued. In fact, it was not until May 20, 2024, that the Parties confirmed all terms of the Agreement. *Id*. at ¶¶33-34.

---

[4] *See*, https://www.dmavalue.com/team/eric-lietzow (last visited 5/20/24).

### III.    FACTUAL OVERVIEW

#### A.  The Parties

As stated above, the Named Plaintiffs and members of the Settlement Collective were remote, hourly CCSAs who were engaged through third-party staffing firms to provide services to Defendant on the State of Massachusetts Health Connector, State of Michigan Unemployment Insurance Agency, State of Kansas COVID-19 Contact Tracing, or State of New Mexico Health of Human Services projects, between November 22, 2020 and January 28, 2024.

In general, CCSAs provided over-the-phone customer service from their home offices to the customers/members of Defendant's clients. [D.E. 24, FAC at 128.] The job duties of CCSAs are explained in further detail in the declarations submitted in support of Plaintiffs' conditional certification motion. [D.E. 29-3 to 29-7.] CCSAs worked from their home offices across the country. In fact, based on the data provided in advance of the mediation, the Settlement Collective worked from at least 45 different states. Ash Decl. at ¶24.

Defendant is a Limited Liability Partnership that is headquartered in Chicago, Illinois. Among other services, Defendant offers corporations and governmental agencies business process outsourcing and customer experience services. To provide these services, Defendant employs some of its own CCSAs (subject to arbitration agreements) and obtains other CCSAs from third-party staffing agencies through its "Contractor Exchange" program. [D.E. 24, FAC at ¶¶ 2-10.]

#### B.  Allegations of Off-the-Clock Work

The Named Plaintiffs and several Opt-in Plaintiffs submitted detailed declarations outlining the alleged off-the-clock work in support of the Conditional Certification Motion. Consistent with the FAC, they estimated approximately 19 minutes of unpaid time related to pre-, mid-, and post-shift computer bootup and shutdown activities. [D.E. 29-3, 29-4, 29-5, 29-6, and

5

29-7.] As explained below, Defendant strongly disputes Plaintiffs' allegations. Ash Decl. at ¶22.

### C. Defendant's Defenses to the Alleged Off-the-Clock Work

From the onset of this case, as explained in its Rule 12 Motion to Dismiss [D.E. 21-22], Defendant denied it employed the members of the Settlement Collective. Thus, according to Defendant, the requisite employer-employee relationship does not exist to trigger the protections of the FLSA (or state wage laws). [D.E. 22 at 8, 11-16.]

Regardless, even if Defendant was determined to be a joint employer, the members of the Settlement Collective received their timekeeping training from, and were paid by, the third-party staffing agencies. Thus, according to Defendant, it cannot be held responsible for off-the-clock work it did not know about or could not have reasonably known about. Ash Decl. at ¶22.

Defendant strongly disputes Plaintiffs' assertions that the computer bootup and shutdown processes took anywhere near 19 minutes per day. To the contrary, in advance of the mediation, Defendant produced evidence that those tasks took a small fraction of the amount of time alleged, which gives rise to another defense raised – that is, there was no uncompensated time related to the computer bootup/shutdown process or if there was, it is *de minimis* and not compensable. *Id*.

Next, Defendant maintains this case is not suitable for class treatment because the CCSAs utilized a self-recording timekeeping system and received different training from their respective third-party vendors. *Id*. As it pertains to Plaintiffs' straight-time claims, Defendant asserts that most of the CCSAs worked in states with no statutory laws for non-overtime wages. As a result, in those states, Plaintiffs must rely on common law claims for breach of contract or unjust enrichment, which Defendant maintains are unlikely to ever be certified. Further, even in many states that have viable statutory laws, numerosity is lacking for class treatment. *Id*.

While Plaintiffs take issue with these defenses, they nonetheless weighed on the Plaintiffs'

decision to settle the case. *Id*.

### D. Summary of Discovery Conducted Prior to Settlement

Prior to filing the Complaint, Plaintiffs' Counsel engaged in substantial pre-suit research, both factual and legal, to identify all appropriate claims on behalf of Plaintiffs and the putative collective. The Plaintiffs conferred and exchanged written correspondence and documents with Plaintiffs' Counsel on dozens of occasions regarding various aspects of the claims. Prior to filing the case, Plaintiffs produced many documents to Plaintiffs' Counsel. Ash Decl. at ¶10.

In the months leading up to the mediation, Defendant made a substantial production of employment documents, which included: position descriptions, offer letters, computer equipment policies, training materials, timecards, work orders, email correspondence related to job duties, pay statements, training materials, power point presentations, and more. Additionally, for the entire Settlement Collective of approximately 4,223 CCSAs, Defendant produced hire and termination dates, payroll data, phone log-in and out records, and other timekeeping data. In sum, the Parties engaged in substantial discovery to evaluate the claims being asserted in the lawsuit. *Id*., at ¶ 19.

### E. Facts Regarding the Settlement Collective and Defendant's Potential Exposure

To assist in synthesizing the large amount of data, and ultimately, to assist in the creation of a damages model, Plaintiffs' Counsel retained the services of expert forensic accountant, Eric Lietzow, CPA/ABV. *Id*., at ¶¶ 23-24. With the assistance of Mr. Lietzow, Plaintiffs' Counsel was able to model damages and identify all the key metrics in the data, such as: 4,223 CCSAs; 85,655 total work weeks; 378,423 total shifts; and an average hourly rate of $19.09. *Id*. Defendant likewise retained its own damages expert.

According to Plaintiffs' damage modeling, at eight (8) minutes of off-the-clock work per shift, and assuming a three (3) year statute of limitations, and including liquidated damages, the

total overtime damages for the Settlement Collective amount to $1,690,964.20. Ash Decl. at ¶25.

Alternatively, according to Plaintiffs' damage model, at six and a half (6.5) minutes of off-the-clock work per shift, and assuming a three (3) year statute of limitations, and including liquidated damages, the total straight time and overtime damages for the Settlement Collective would amount to $1,686,906.44. *Id*. However, the FAC does not allege any Rule 23 claims on a nationwide basis, and based on the data produced by Defendant, most states would not meet Rule 23 numerosity requirement or do not have state statutory laws for unpaid straight time wages. Thus, without this settlement, many members of the Settlement Collective would face significant obstacles to recover any non-overtime wages in this lawsuit.

At the mediation, Defense Counsel prepared a slide show presentation for the Mediator and Plaintiffs' Counsel, which provided Defendant's explanation of how CCSAs routinely log-into their computer systems. Additionally, Defendant retained an expert to review the time-stamped logs of activities from several of the Plaintiffs' Accenture issued computers. Defendant's expert compared the timestamps between when the computer was turned on and when the Plaintiffs began loading their computer systems. He also identified the days that the Plaintiffs turned their computers on ("cold start") versus the days they simply woke their computers up by wiggling the mouse ("warm start"). Defendant's expert concluded that on 85% of the days, Plaintiffs began from a warm start and the bootup time takes less than two minutes to complete from start to finish.[5]

Plaintiffs disagree with the conclusions reached by Defendant's expert; however, at a minimum, Defendant has raised an argument that suggests the computer bootup activities took far less time than time Plaintiffs alleged in the FAC.

Further, in response to Plaintiffs' assertion that Defendant refused to pay overtime

---

[5] More specifically, Defendant's analysis concluded that even on a cold start, to complete the 9-10 bootup tasks alleged in the FAC took the CCSAs less than two (2) minutes 91% of the time.

premiums for unapproved overtime hours, Defendant produced evidence at the mediation that 99.5% of reported overtime hours were paid at 1.5 times the CCSAs' regular hourly rate. Again, Plaintiffs disagree with the conclusions reached by Defendant from this data, but the evidence and argument underscore the highly disputed nature of the claims asserted in the FAC.

## IV. TERMS OF THE SETTLEMENT

### A. The Settlement Fund

The Agreement establishes a Common Fund of $1,695,000.00. *Exh. 1*, at ¶1.23. The Common Fund covers the Collective Representative Service Awards, Plaintiffs' Counsel's attorney's fees and costs, the Settlement Administrator's fees and costs, and the payments to the Participating Plaintiffs. *Id.*, at ¶3.1. The Common Fund does not include any Employer Payroll Taxes, which will be funded separately by Defendant. *Id.*, at ¶1.14.

### B. The Settlement Collective

Settlement Collective Members means Named Plaintiffs, Opt-in Plaintiffs, and any and all current and former CCSAs who were engaged through third-party staffing firms to provide services to Defendant on the State of Massachusetts Health Connector, State of Michigan Unemployment Insurance Agency, State of Kansas COVID-19 Contact Tracing, or State of New Mexico Health of Human Services projects, between November 22, 2020 and January 28, 2024 (the "Relevant Period"). *Id.*, at ¶1.9.

### C. Settlement Claims Administration

The Parties have mutually selected ILYM, Inc. to serve as the Settlement Claims Administrator. *Id.*, at ¶1.22. The Settlement Claims Administrator duties are set forth in the Agreement and include: scraping the mailing list against the National Change of Address data set maintained by the United States Postal Service, mailing Notices and Claim Forms to Settlement

9

Collective Members in accordance with the Court's Approval Order; responding to Settlement Collective Member inquiries; ensuring that the Settlement Collective Members are provided with IRS Form W-2s and IRS 1099 MISC forms as appropriate; collecting the relevant tax documents from the Settlement Collective Members; resolving disputes relating to Participating Plaintiffs' settlement amounts; reporting on the state of the settlement to the Parties; calculating the Settlement Checks in accordance with the Court's Approval Order; calculating Participating Plaintiffs' share of taxes, distributing Settlement Checks to Participating Plaintiffs and withholding Participating Plaintiffs' share of taxes; remitting such tax payments (i.e., withheld Participating Plaintiffs' share of taxes) to the appropriate taxing authorities; providing Claim Forms to Defendant's Counsel and Collective Counsel; providing redacted Claim Forms to Collective Counsel suitable for filing; providing counsel with any information related to the administration of the settlement upon request; and performing such other duties as the Parties may jointly direct. *Id.*, at ¶2.2. The Agreement provides for settlement administration fees and expenses of up to $50,000.00. *Id.*, at ¶2.2(A).

### D. Notice and Claim Procedure

Upon approval and dismissal of the Lawsuit without prejudice, Defendant will provide notice of the Agreement to the various staffing agencies associated with the Settlement Collective and request the most recent contact information for each member of the Settlement Collective be produced no later than 14 days (the "Collective List").[6] *Exh. 1*, at ¶2.5(A). Within 14 days of receipt of the requested information from the various staffing firms, Defendant will produce the Collective List to the Claims Administrator, who will then "scrape" the mailing list provided

---

[6] Considering 7th Circuit precedent and Your Honor's Case Procedures, the Parties have agreed the initial dismissal contemplated in the Parties' Agreement and the Court's approval order should be a dismissal without prejudice, which automatically converts to a dismissal with prejudice 30 days after the Individual Settlement Payments are sent to Participating Plaintiffs.

against the United States Postal Service NCOA. *Id.* Within 7 days of receipt, the Claims Administrator will mail the Parties' proposed Notice to the Settlement Collective Members, via First-Class United States Mail. *Id.*, at ¶2.5(B). *See also*, Proposed Notice and Claim Form, Exh. 1, Agreement at Exhibit A.

On the 30th calendar day following the date that the Claims Administrator initially mailed Notices, or 5 days thereafter, the Claims Administrator will send notice to all counsel as to the number of Settlement Collective members who have returned claim forms. Defendant shall then have the option to request that the Notice be resent via mail and e-mail to any members of the Settlement Collective that have not already submitted a claim form. *Id.*, at ¶2.5(D).

The Settlement Collective will have 75 days from the date of mailing to submit a Claim Form (the "Consent Deadline"). *Id.*, at ¶1.4, ¶ 2.5(B). Any Settlement Collective member that returns a timely Claim Form will become a Participating Plaintiff and receive his or her share of the Collective Settlement Fund. *Id.*, at p. 9-10.

### E. The Releases

In exchange for the payment provided under the Agreement, Participating Plaintiffs will be subject to a release of all wage and hour claims ("Released Wage and Hour Claims"). *Id.*, ¶4.1(A). Only the Named Plaintiffs will be subject to a General Release of all claims. *Id.*, ¶4.1(B). Any member of the Settlement Collective who does not participate will not provide a release of any claims.

### F. Allocation Formula

The Claims Administrator will divide the Collective Settlement Amount by the total number of full or partial work weeks that all Settlement Collective Members were engaged to provide services on the State of Massachusetts Health Connector, State of Michigan

Unemployment Insurance Agency, State of Kansas COVID-19 Contact Tracing, or State of New Mexico Health of Human Services projects during the Relevant Period ("Per Work Week Amount"). The Claims Administrator will multiply the Per Work Week Amount by the total number of full or partial work weeks that each Settlement Collective Member was employed during the Relevant Period to arrive at an estimated "Individual Settlement Amount," for each Collective Member. Provided a Settlement Collective Member timely returns an executed claim form to become a Participating Plaintiff, such individual's Individual Settlement Amount will be paid as set forth in this Agreement and allocated as follows: 50% as wages; 50% as non-wage compensation, including liquidated damages related to the same claims. The Claims Administrator will be responsible for issuing a form W-2 for the amount deemed wages and an IRS Form 1099 for the portions allocated to liquidated damages. Exh. 1, ¶3.1(B).

### G. Collective Representative Service Awards

The Agreement provides for the Named Plaintiffs to receive Collective Representative Service Awards in the amount of $5,000.00 each (total of $15,000.00) for the Named Plaintiffs' time, effort, and risk in bringing and prosecuting this matter, as well as for executing a General Release of claims. *Exh. 1*, ¶3.2A(C).

### H. Attorney Fees and Litigation Costs

Under the Agreement, subject to Court approval, Plaintiffs' Counsel will receive $565,000.00 (one-third of the $1,695,000.00 settlement fund) as attorneys' fees, plus reimbursement of up to $15,000.00 in out-of-pocket costs and expenses incurred in litigating and resolving this matter. Any unused funds allocated to litigation costs will pour into the Collective Settlement Amount. *Exh. 1*, ¶3.2(A).

## V. ARGUMENT IN SUPPORT OF APPROVAL

### A. Standard for Approval

Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes. *See, e.g.*, *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982); *Ceniceros v. Pactiv, LLC*, No. 18-CV-1759, 2019 WL 13252838, at *1 (N.D. Ill. Jan. 17, 2019); *Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 994-95 (N.D. Ind. 2010); *see also Butler v. Am. Cable & Telephone, LLC,* No. 09 Civ. 5336, 2011 WL 4729789, at *8-9 (N.D. Ill. Oct. 6, 2011). If the proposed settlement reflects a reasonable compromise over contested issues, the court should approve the settlement. *Lynn's Food Stores*, 679 F.2d at 1354; *Roberts v. Apple Sauce, Inc.,* No. 12 Civ. 830, 2014 WL 4804252, at *2 (N.D. Ind. Sept. 25, 2014). "It is a well settled principle that the law generally encourages settlements." *Dawson v. Pastrick,* 600 F.2d 70, 75 (7th Cir. 1979). *See also*, *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation.")

### B. Procedure for FLSA Collective Action Settlements

As then District judge (now Seventh Circuit judge) Amy St. Eve explained in *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 1:15-CV-10447, 2016 WL 7018566, at *1 (N.D. Ill. Nov. 29, 2016):

> A one-step settlement approval process is appropriate. *See, e.g.*, *Koszyk v. Country Fin. a/k/a CC Servs., Inc.*, No. 16 Civ. 3571, 2016 WL 5109196, at *1 (N.D. Ill. Sept. 16, 2016) ("A one-step settlement approval process is appropriate [ ]" in FLSA settlements."); *Watson, et al. v. BMO Financial Corp. and BMO Harris Bank, N.A.*, No. 15 Civ. 11881 (N.D. Ill. July 11, 2016) (St. Eve, J.), ECF Nos. 34, 39 (granting request for one-step approval process); *Prena v. BMO Fin. Corp.,* No. 15 Civ. 9175, 2015 WL 2344949, *1 (N.D. Ill. May 15, 2015) (same). Collective actions under 29 U.S.C. § 216(b) require workers to affirmatively opt-in to the litigation, unlike in a Federal Rule of Civil Procedure 23 class action. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013); *see also Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1529 (2013) ("Rule 23 actions are

> fundamentally different from collective actions under the FLSA."). Because the failure to opt in to an FLSA lawsuit does not prevent potential members of the collective from bringing their own suits in the future, *McKenna v. Champion Int'l Corp.*, 747 F.2d 1211, 1213 (8th Cir. 1984), *abrogated on other grounds by Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989), FLSA collective actions do not implicate the same due process concerns as do Rule 23 actions. *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013); *see also Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982) (discussing due process concerns present in Rule 23 class action that are not present in FLSA collective actions).

*See also, Ceniceros* at *2 (N.D. Ill. Jan. 17, 2019) (same); *Castillo v. Noodles & Co.*, No. 16-CV-03036, 2016 WL 7451626, at *1 (N.D. Ill. Dec. 23, 2016) (same); *Prena* (same).

Courts in this Circuit routinely approve one-step, common fund, one-third (or more) attorney fee FLSA settlements similar to the Parties' Agreement presently before the Court for approval. In fact, the structure of the Parties' proposed Agreement is the standard for the FLSA settlements. *See*, *e.g.*, *Briggs*; *Castillo*; *Prena*; *Furman v. At Home Stores LLC*, No. 1:16-CV-08190, 2017 WL 1730995 (N.D. Ill. May 1, 2017); *Kujat v. Roundy's Supermarkets Inc.*, No. 1:18-CV-05326, 2021 WL 4551198 (N.D. Ill. Aug. 11, 2021); *Brewer v. Molina Healthcare, Inc.*, No. 1:16-CV-09523, 2018 WL 2966956 (N.D. Ill. June 12, 2018); *Benoskie v. Kerry Foods, Inc.*, No. 19-CV-684-PP, 2020 WL 5769488 (E.D. Wis. Sept. 28, 2020); *Mollett v. Kohl's Corp.*, No. 21-CV-707-PP, 2022 WL 4641082 (E.D. Wis. Sept. 30, 2022); *Winking v. Smithfield Fresh Meats Corp.*, No. 1:22-CV-01937, 2022 WL 16706898 (N.D. Ill. Nov. 4, 2022).

## C. The Settlement Provides a Fair and Reasonable Resolution of Bona-Fide Disputes

As referenced above, in a FLSA case, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes. If the proposed settlement reflects a reasonable compromise over contested issues, the court should approve the settlement." *Briggs* at *1; *Castillo* at *1 (same); *see also*, *Lynn's Food Stores* at 1354.

*1. The Amount of the Settlement is Fair and Reasonable*

14

The Parties' proposed Agreement is the result of both sides accepting the mediator's proposal, from one of the most respected wage and hour mediators in the country, after a full day of mediation. Ash Decl. at ¶¶31-32. These facts establish that the Agreement represents a reasonable compromise over a bona fide dispute.

Indeed, Defendant strongly disputes all the claims asserted by Plaintiffs and denies any wrongdoing whatsoever. However, even assuming some off-the-clock work occurred, and Plaintiffs prevail entirely on the many contested issues (*e.g.* collective/class certification, joint employment, willfulness, etc.), according to Defendant's expert analysis, the off-the-clock work was limited to one (1) to two (2) minutes. Ash Decl. at ¶22.

Despite the many defenses asserted, the proposed $1,695,000.00 common fund Agreement secured by Plaintiffs provides an excellent recovery for the Settlement Collective. Indeed, based on Plaintiffs' damage model, the Parties proposed Agreement amounts to approximately eight (8) minutes of unpaid overtime per day, plus liquidated overtime damages, and under a three (3) year statute of limitations ($1,690,964.20). Alternatively, the relief provided by the Parties' Agreement can be viewed as approximately six and a half (6.5) minutes of unpaid overtime premiums per day, plus liquidated overtime damages, plus six and a half (6.5) minutes of straight time damages, and with a three (3) year statute of limitations ($1,686,906.44). Ash Decl. at ¶25.

The Parties' proposed Agreement easily meets the standard for approval. The Agreement was the result of pre-suit investigation, motion practice, extensive discovery, and arms-length negotiations with the assistance of a qualified wage and hour mediator.

Furthermore, the settlement amount of $1,695,000.00 is substantial, especially considering the substantial risk that Plaintiffs face in this litigation. Recall, all members of the Settlement Collective were classified by Defendant as independent contractors and worked for Defendant

through dozens of different staffing agencies. Should discovery reveal meaningful differences in the instructions received from the staffing agencies relative to subjects such as timekeeping or schedule adherence, then those differences could prevent collective or class certification. In that case, the Settlement Collective will be forced to pursue their own individual claims to make any recovery at all. Likely, given the size of the individual claims at issue, most Settlement Collective members would be unable to obtain an attorney to pursue their claims.

### 2. The Method of Distributing the Settlement is Fair and Reasonable

Similarly, the proposed methodology for distributing the Collective Settlement Amount based on the number of weeks they provided services for Defendant is reasonable and fair. Many courts approve settlements based on the same or similar pro-rata formulas. *See, Summers v. UAL Corp. ESPO Comm.*, No. 03 Civ. 1537, 2005 WL 3159450, at *2 (N.D. Ill. 22, 2005) (approving allocation plan as reasonable when "settlement funds … will be disbursed on a pro rata basis"); *see also Gallant v. Arrow Consultation Servs., Inc.*, No. 119CV00925SEBMPB, 2020 WL 2113399, at *2 (approving allocation formula based on work weeks in FLSA settlement); *Mollett,* 2022 WL 4641082, at *1 (same).

### 3. The Proposed Notice is Fair and Reasonable

The Parties' proposed Notice and Claim Form, Exhibit A to the Agreement, informs the Settlement Collective of the terms of the settlement, including the allocation formula, how they may participate (or not participate), the settlement payment to which they are entitled, the release, and the request for attorneys' fees and costs. Thus, the Court should approve the proposed Notice and Claim Form. *See*, *Koszyk*, 2016 WL 5109196, at *2 (approving class notice that, inter alia, described settlement terms and fee allocation).

In sum, the Parties' proposed Agreement provides the Settlement Collective with

16

immediate, substantial relief for heavily disputed claims. Without the Agreement, the Plaintiffs could potentially litigate this case for several years and make no recovery at all. The outcome of this litigation is far from certain given the many legal obstacles Plaintiffs must overcome.

**D. The Requested Collective Representative Service Awards are Fair and Reasonable**

"Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). This is especially true in employment litigation. *See, Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, at *7 (S.D.N.Y. June 25, 2007) ("[I]n employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers.").

"Incentive awards serve the important purpose of compensating plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs." *Briggs* at *2. "In examining the reasonableness of a requested service award, courts consider: (1) the actions the plaintiffs have taken to protect the interests of the class, (2) the degree to which the class has benefited from those actions, and (3) the amount of time and effort the plaintiffs expended in pursuing the litigation." *Id*.

First, Named Plaintiffs took substantial actions to protect the interests of the putative Settlement Collective, and those actions resulted in a substantial benefit. They participated in an extensive pre-suit investigation, provided documents crucial to establishing Plaintiffs' claims, participated in countless conference calls with Collective Counsel, submitted detailed declarations in support of Plaintiffs' Pre-Discovery Motion for Conditional Certification that played a pivotal

role in the litigation and at the mediation, and participated in the mediation in Nashville (by phone). Ash Decl. at ¶31, 48.

Second, the Settlement Collective will clearly benefit from the Named Plaintiffs efforts, as each Participating Plaintiff will receive a substantial payment to account for the off-the-clock work alleged in the FAC.

Third, the amount of time and effort expended by the Named Plaintiffs warrants the requested Collective Representative Service Awards. Throughout this litigation, the Named Plaintiffs were on-call to assist Collective Counsel in their prosecution of the case. As stated above, this involved producing documents and answering factual questions that were presented throughout the litigation.

The requested Collective Representative Service Awards are well within the range of services awards approved in similar cases. *Furman* 2017 WL 1730995 (N.D. Ill. May 1, 2017), at *3 (approving $10,000 service award to named plaintiff in overtime collective action); *Briggs* 2016 WL 7018566, at *2 (approving $12,500 service awards to named plaintiff in overtime collective action); *Castillo*, 2016 WL 7451626, at *2 (approving $10,000 service awards to named plaintiff in overtime collective action); *Koszyk*, 2016 WL 5109196, at *2 (same); *Brewer v. Molina Healthcare, Inc.*, No. 1:16-CV-09523, 2018 WL 2966956, at *2 (N.D. Ill. June 12, 2018) (awarding service awards between $3,000 to $7,500).

**E. The Requested Attorney Fees are Fair and Reasonable**

*1. The Court Should Award Attorneys' Fees as a Percentage of the Fund*

The Court should award attorneys' fees as a percentage of the total fund made available to the Collective. When counsel's efforts result in the creation of a common fund, counsel is "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472,

478 (1980); *see also Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 548 (7th Cir. 2003) (holding creation of a common fund "entitles [counsel] to a share of that benefit as a fee"). This is "based on the equitable notion that those who have benefited from litigation should share in its costs." *Sutton v. Bernard*, 504 F.3d 688, 691-92 (7th Cir. 2007) (*quoting Skelton v. G.M. Corp.*, 860 F.2d 250, 252 (7th Cir. 1988)); *Kaplan v. Houlihan Smith & Co.*, No. 12 Civ. 5134, 2014 WL 2808801, at *3 (N.D. Ill. June 20, 2014); *see also Boeing*, 444 U.S. at 478.

Although there are two ways to compensate attorneys for a settlement of statutory claims – the lodestar method and the percentage of the fund method, *see Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565-66 (7th Cir. 1994), the trend in the Seventh Circuit is to use the percentage of the fund method in common fund cases like this one. *See Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *7 (N.D. Ill. Oct. 10, 1995) (noting "this circuit recognized the trend toward the percentage method" and "the Seventh Circuit strongly endorsed the percentage method") (*citing Matter of Continental Illinois Securities Litigation*, 985 F.2d 867 (7th Cir. 1993)).

Indeed, the percentage of the fund method is standard for FLSA common fund collective action settlements in this Circuit. *See*, *Briggs* 2016 WL 7018566, at *3; *Castillo* 2016 WL 7451626, *at *5*; *Prena* 2015 WL 2344949, at *3; *Furman* 2017 WL 1730995, at *3; *Kujat* 2021 WL 4551198, at *3; *Brewer* 2018 WL 2966956 at *3; *Benoskie* at *3; *Mollett* 2022 WL 4641082 at *3; *Winking* 2022 WL 16706898  at *2*; Gallant* 2020 WL 2113399, at *4; *Chen v. Genesco, Inc.*, No. 118CV00690SEBTAB, 2020 WL 360517, at *5 (S.D. Ind. Jan. 22, 2020); *Day v. NuCO2 Mgmt., LLC*, No. 1:18-CV-02088, 2018 WL 2473472, at *2 (N.D. Ill. May 18, 2018); *Koszyk*, 2016 WL 5109196, at *4.

It is especially appropriate to use a common fund approach in cases based on fee shifting statutes when the "settlement fund is created in exchange for release of the defendant's liability

both for damages and for statutory attorneys' fees …" *Skelton*, 860 F.2d 256; accord *Florin*, 34 F.3d at 564. Here, the settlement releases the Settlement Collective's statutory claims to fees.

There are several other reasons that courts in the Seventh Circuit favor the percentage of the fund method. First, the percentage of the fund method promotes early resolution, and removes the incentive for plaintiffs' lawyers to engage in wasteful litigation to increase their billable hours. *See*, *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 979-80 (7th Cir. 2003). *See also*, *Day* at *2 (FLSA collective settlement holding "the Court finds that the percentage method is appropriate here because Plaintiffs' Counsel accomplished what that method incentivizes: early resolution of the case without wasteful litigation to increase loadstar hours."); *Winking* 2022 WL 16706898 at *3 (same). Where attorneys' fees are limited to a percentage of the total fund, "courts can expect attorneys to make cost-efficient decisions about whether certain expenses are worth the win." *Gaskill v. Gordon*, 942 F. Supp. 382, 386 (N.D. Ill. 1996), *aff'd*, 160 F.3d 361 (7th Cir. 1998); *see also In re Amino Acid Lysine Antitrust Litig.*, No. 95 Civ. 7679, 1996 WL 197671, at * 2 (N.D. Ill. Apr. 22, 1996) (explaining "growing recognition that in a common fund situation … a fee based on a percentage of recovery … tends to strike the best balance in favor of the clients' interests while at the same time preserving the lawyers' self-interest").

Additionally, the percentage of the fund method preserves judicial resources because it saves the Court from the cumbersome task of reviewing complicated and lengthy billing documents. *Florin*, 34 F.3d at 566 (noting "advantages" of percentage of the fund method's "relatively simplicity of administration"); *Gaskill*, 942 F. Supp. At 386 (*citing Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (fee requests "should not result in a second major litigation")).

Indeed, Courts in this district routinely apply the percentage method to common fund settlements and have noted the advantages of this approach. *See, e.g.*, *In re AT&T Mobility*

*Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1040 (N.D. Ill. 2011) (using percentage method because it did "not need to resort to a lodestar calculation, which would be costly to conduct, to reinforce the same conclusion"); *Gaskill*, 942 F. Supp. at 386 (describing advantages of percentage method, including judicial efficiency and an "efficient check on the attorney's judgment" in economic decision-making). As the Second Circuit has explained, the "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 48-49 (2d Cir. 2000) (citation omitted).

   2. *Results and Benefits Conferred Upon the Class Justify the Fee Award*

   Under the Parties' proposed Agreement, the Settlement Collective will receive a substantial cash payment. As stated above, the Agreement creates a common fund of $1,695,000.00 in exchange for a release of all wage and hour claims.[7] As referenced above, based on Plaintiffs' damage model, the Agreement will provide 16 minutes of unpaid overtime (8 minute liquidated) when the FAC alleged 19 minutes. That's essentially 84% of the alleged unpaid overtime, when, admittedly, Defendant has provided evidence that the computer bootup/shutdown activities arguably take substantially less time than initially alleged. Ash Decl. at ¶26.

   There is also absolutely no indication of any collusion in obtaining the Agreement. Both sides zealously advocated for their clients and required the assistance of an esteemed mediator to resolve the case. *Id.* at ¶¶ 31, 32. *See*, *Steele v. GE Money Bank*, No. 1:08-CIV-1880, 2011 WL 13266350, at *4 (N.D. Ill. May 17, 2011) ("The involvement of an experienced mediator is a further protection for the class, preventing potential collusion.")

   Moreover, the case at bar poses significant risks regarding the merits of the claims, the

---

[7] Named Plaintiffs *only* will be subject to a general release as part of the consideration for the Collective Representative Service Awards.

alleged willfulness of the violations, Defendant's knowledge of the unreported off-the-clock work, and collective/class certification. Plaintiffs remain confident they would prevail on their claims, but as the Court knows, there are risks inherent in litigation. For example, even if Plaintiffs established the merits of their claims and prevailed on collective/class certification, if Plaintiffs are unable to establish the Defendant's violation was willful, the statute of limitations would only provide for a two-year lookback, which would bar many individuals' claims altogether.

3. *Analysis of the Market for Legal Services Supports Plaintiffs' Fee Request*

"In awarding attorneys' fees, courts ultimately 'must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Briggs* at \*3, *quoting In re Synthroid*, 264 F.3d at 718. District courts "undertake an analysis of the terms to which the private plaintiffs and their attorneys would have contracted at the outset of the litigation when the risk of loss still existed." *Sutton*, 504 F.3d at 692. They must "do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, [and] information from other cases[.]" *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005).

    a. *Plaintiffs' Request for One-Third of the Settlement Is the Normal Rate of Compensation in the Northern District of Illinois Market*

The attorneys' fees that Plaintiffs' Counsel request are based on the market in the Northern District of Illinois. *Id*. at 600 (approving attorneys' fees based on, inter alia, "legal hurdles that lead counsel faced in proving liability") (citing *Donovan v. Estate of Frank E. Fitzsimmons*, 778 F.2d 298, 309 (7th Cir. 1985)). Plaintiffs' Counsel are experienced and nationally recognized for their expertise in litigating complex class and collective actions, including wage and hour cases like this one (attorney Ash has litigated over 40 collective and class actions for call center workers), and are justified in seeking compensation in the form of one-third of any potential settlement (plus

22

costs) for their efforts. Ash Decl., ¶¶ 4-8; Frisch Decl., ¶¶ 2-16; Rodriguez Decl., ¶3.

Before agreeing to take on this matter, Plaintiffs' Counsel agreed with the Named Plaintiffs to take a percentage of the (at that time uncertain) future total settlement amount, plus costs. In fact, the Named Plaintiffs agreed to permit Plaintiffs' Counsel to seek up to 40% of their recovery. Ash Decl. at ¶41. However, Plaintiffs' Counsel only seeks the customary fee for the Northern District of Illinois, which is one-third of the common fund. Thus, the Court knows what private plaintiffs "would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed)," *In re Synthroid*, 264 F.3d at 718, 720, because the Named Plaintiffs contracted for Plaintiffs' Counsel to be compensated in the same manner as provided in the Parties' Agreement. *See*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 844-45 (N.D. Ill. 2015) (stating "presumption of market-rate reasonableness would have attached if parties had establish[ed] a fee structure at the outset of [the] lawsuit"); *see also*, *Koszyk*, 2016 WL 5109196, at *4.

In the Northern District of Illinois, class and collective action employment lawyers routinely contract to receive one-third (or even more) of any potential settlement as compensation for taking on the risk of funding a potential multi-year litigation without any assurance of recovery. *See Koszyk*, 2016 WL 5109196, at *4. In addition, one-third is the standard contingent percentage that employment lawyers in the district charge individual clients. *Id*.

These multiple data points, confirming that plaintiffs routinely are willing to agree to a one-third contingency fee arrangement, reinforce that Plaintiffs' Counsel request the proper market rate. *See In re Synthroid*, 325 F.3d at 976. Furthermore, this is why courts in this Circuit regularly agree that "a counsel fee of 33.3.% of the common fund is comfortably within the range typically charged as a contingency fee by plaintiffs' lawyers in a FLSA action." *Burkholder*, 750 F. Supp.

23

2d at 997 (internal citation and quotation marks omitted, collecting cases); *see also*, *Briggs* at *3 (approving at least one-third of the common fund plus costs in a one-step FLSA settlement); *Castillo at *5* (same); *Prena* at *3 (same); *Furman* at *3 (same); *Kujat* at *3 (same); *Brewer* at *3 (same); *Benoskie* at *3 (same); *Mollett* at *3 (same); *Winking*  at *2 (same)*; Gallant* at *4 (same); *Chen* at *5 (same); *Day* at *2 (same); *Koszyk* at *4 (same). These awards of "attorneys' fees from analogous class action settlements are indicative of a rational relationship between the record in this similar case and the fees [Plaintiffs propose should be] awarded by the [Court]." *Taubenfeld*, 415 F.3d at 600.

Here, Plaintiffs' Counsel's requested fee is well within the market rate for common fund wage and hour actions within the Northern District of Illinois. *See id*. at 599-600 (noting class actions in the Northern District of Illinois have awarded fees of 30-39% of the settlement fund); *Gaskill v. Gordon*, 160 F.3d 361, 362-63 (7th Cir. 1998) (noting "[t]he typical contingent fee is between 33 and 40 percent" and affirming award of 38% of fund).

### b. The Risk of Nonpayment Was Significant.

Plaintiffs' Counsel's decision to charge the market rate is also reasonable in light of the significant risks of nonpayment that Plaintiffs' Counsel faced. At the outset of the representation, Plaintiffs' Counsel took "on a significant degree of risk of nonpayment" in agreement to represent Plaintiffs. *Taubenfeld*, 415 F.3d 600 (approving of district court's reliance on this factor in evaluating attorneys' fees). Indeed, at the outset of this litigation Plaintiffs faced a motion to dismiss the case in its entirety. [D.E. 22.] Plaintiffs' Counsel took this case on a contingent basis, meaning that there was a strong risk that that they would not be paid. *See Sutton*, 504 F.3d at 693-94 ("We recognized [in an earlier case] that there is generally some degree of risk that attorneys will receive no fee (or at least not the fee that reflects their efforts) when representing a class

because their fee is linked to the success of the suit."). Should the Court reject the settlement, Plaintiffs' Counsel also face significant legal hurdles in establishing certification and proving liability. As the Seventh Circuit has noted, Plaintiffs' Counsel "could have lost [and still could lose] everything" they invested. *In re Cont'l Ill. Secs. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992); *Koszyk*, 2016 WL 5109196, at *4.

    4. *Plaintiffs' Counsel's Fee Request is Reasonable and Should Be Approved Without a Cross-Check*

      Plaintiffs' Counsel's fee request should be approved because it is reasonable based on the market rate. No further showing or analysis is needed. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 n. 27 (N.D. Ill. 2011) ("use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive"); *see also*, *In re Forefront Data Breach Litig.*, No. 21-CV-887, 2023 WL 6215366, at *8 (E.D. Wis. Mar. 22, 2023) ("I do not believe that a lodestar crosscheck would be useful in this case. The market rate for plaintiff's counsel in a damages case is generally a contingent fee, *Gaskill*, 160 F.3d at 362–63, and any lodestar calculation would be artificial."). Recently, the Seventh Circuit once again held that in a common fund settlement a "lodestar crosscheck was unnecessary." *In re Stericycle Sec. Litig.*, 35 F.4th 555, 567 (7th Cir. 2022). *See also*, *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("we have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach."); *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("consideration of a lodestar check is not an issue of required methodology.").

      In fact, "use of a lodestar cross-check has fallen into disfavor." *Beesley v. Int'l Paper Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014). As the Seventh Circuit explained, "[t]he client cares about the outcome alone" and class counsel's efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced." *In*

*re Synthroid Marketing Litig.,* 325 F.3d at 979–80 (7th Cir. 2003).

For these reasons, as confirmed by the cases cited herein, courts do not conduct crosschecks in FLSA common fund settlements. *See*, *e.g.*, *Briggs*, 2016 WL 7018566 ($6 million dollar settlement, no cross check on $2 million dollar fee); *Castillo*, 2016 WL 7451626 ($3 million dollar settlement, no cross check on $1 million dollar fee). *See also*, Ash Decl., ¶40.

## F. Litigation Costs, and Settlement Administration Costs

To secure this settlement Agreement, Plaintiffs' Counsel reasonably incurred $11,433.36 in litigation expenses to date. All these costs were reasonable and necessary. The table below identifies each of the costs incurred.

| Expense | Amount |
|---|---|
| Case Filing Fee | $402.00 |
| Service of Process | $95.00 |
| Travel (airfare, lodging, working meals, cabs, etc.) | $3,448.86 |
| Desmond, Marcello, & Amster (damages expert) | $2,187.50 |
| Miles Mediation (mediation) | $5,300.00 |
| **TOTAL** | **$11,433.36** |

Ash Decl. at ¶ 47; Rodriguez Decl. at ¶7.

Additionally, as explained above, the Parties mutually selected ILYM, Inc. to perform the settlement administration duties required under the Agreement. ILYM, Inc. is a reputable and experienced settlement administrator and their expense of $50,000.00 is reasonable and necessary based on the size of this case. Ash Decl. at ¶46.

## VI. CONCLUSION

For all of the reasons stated herein, Plaintiffs respectfully request that the Court issue an order substantially similar to the Proposed Order emailed to the Court: (1) approving the $1,695,000.00 Agreement as fair, adequate, and reasonable, as set forth in the Settlement

Agreement and Release; (2) approving the proposed Settlement Notices and direct their distribution; (3) approving service award of $5,000.00 each to Named Plaintiffs for their service to the collective; (4) approving Plaintiffs' request for one-third of the Common Fund ($565,000.00) for attorneys' fees and litigation costs up to $15,000.00; (5) approving the Claims Administrator's fees of up to $50,000.00; (6) retaining jurisdiction to enforce the terms of the settlement Agreement; (7) dismissing this case without prejudice with leave to reinstate within thirty (30) days after the Individual Settlement Payments are issued to Participating Plaintiffs, and subsequently, if not reinstated within that time, converting the dismissal to a dismissal with prejudice.

Dated: June 14, 2024

Respectfully Submitted,

**ASH LAW, PLLC**

_s/ Charles R. Ash, IV_
Charles R. Ash, IV (P73877) (_Admitted_)
402 W. Liberty St.
Ann Arbor, MI 48103-4388
Phone: (734) 234-5583
cash@nationalwagelaw.com

**MORGAN & MORGAN, P.A.**
Andrew R. Frisch (FBN 027777) (_Admitted_)
55 E Monroe Street, Suite 3800
Chicago, IL 60603
Phone: (954) WORKERS
Fax: (954) 327-3013
AFrisch@forthepeople.com

**HOOPER HATHAWAY, P.C.**
Oscar Rodriguez (P73413) (_Admitted_)
126 S. Main St.
Ann Arbor, MI 48104-1903
Phone: (734) 662-4426
orod@hooperhathaway.com

_Counsel for Plaintiff and the_
_Putative Collective/Class Members_

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*s/ Charles R. Ash, IV*